SOUTHERN PACIFIC COMPANY *v.* INTERSTATE COMMERCE COMMISSION.

SOUTHERN CALIFORNIA RAILWAY COMPANY *v.* SAME.

ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY *v.* SAME.

SANTA FE PACIFIC RAILROAD COMPANY *v.* SAME. SOUTHERN PACIFIC COMPANY *v.* SAME.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

Nos. 158, 159, 160, 161, 162. Argued January 23, 24, 1906.—Decided February 26, 1906.

The Southern Pacific and other railroads published a guaranteed through rate on citrus fruits from California to the Atlantic seaboard. The shippers availing of this rate routed the goods themselves from the terminals of the initial carriers and illegally obtained rebates for the routing from the connecting carriers. To prevent this—and the action was successful—the initial carriers republished the rate reserving the right to route the goods beyond their own terminals. On complaint of shippers the Interstate Commerce Commission ordered the initial carriers to desist from enforcing the new rule, holding it violated § 3 of the Interstate Commerce Act by subjecting the shippers to undue disadvantage. The Circuit Court sustained the Commission but on the ground that the routing by the carrier amounted, although no other agreement was proved in re-

gard thereto, to a pooling of freights and violated § 5 of the act. *Held,* error and that:

As the general purpose of the act was to facilitate commerce and prevent discrimination it will not be construed so as to make illegal a salutary rule to prevent the violation of the act in regard to obtaining rebates.

The question of joint through rates is, under the act, one of agreement between the companies and under their control, and nothing in the act prevents an initial carrier guaranteeing a through rate to reserve in its published notice thereof the right to route the goods beyond its own terminal.

A carrier need not contract to carry goods beyond its own line, or make a through rate; if it does agree so to do, it may do so by such lines as it chooses, and upon such reasonable terms, not violative of the law, as it may agree upon; and this right does not depend upon whether it agrees to be liable for default of the connecting carrier.

The fact that the initial carrier, in order to break up the practice of rebating by the connecting carriers, promises them fair treatment and carries out the promise by giving them certain percentages of its guaranteed through rate business, does not amount to a pooling of freights within the meaning of § 5 of the Interstate Commerce Act.

A reservation applicable to a single business by the initial carrier, guaranteeing a through rate, of the right to route goods beyond its own terminal does not amount to an unlawful discrimination within the prohibition of the act if the business is of a special nature, like the fruit business, having nothing in common with other freight.

In a suit by the Interstate Commerce Commission to enforce an order made by it, the court is not confined in passing on the validity of the order to the reasons stated by the Commission.

THESE are appeals from orders or decrees of the Circuit Court of the United States for the Southern District of California, in proceedings wherein that court affirmed, and ordered to be enforced, the determination of the Interstate Commerce Commission, relating to the above-named railroad companies, directing them to desist from maintaining or enforcing a rule adopted by them and pertaining to shippers of oranges and other citrus fruits in Southern California, whereby those shippers were denied their alleged right of designating the routes for the transportation of their property from California to the eastern markets, under a tariff of through rates, as mentioned in the orders or decrees.

The proceeding in each case was commenced before the Commission under sections 13, 14 and 15 of the Interstate

Commerce Act, U. S. Comp. Stat. pp. 3154–3164; 24 Stat. 379, by the filing of a petition with the Commission, on the part of certain corporations of the State of California, called the Consolidated Forwarding Company, and the Southern California Fruit Exchange, engaged in the business of shipping oranges and other citrus fruit from Southern California to the eastern markets. The proceeding was continued in the Circuit Court under section 16 of the act. The petition charged the railroads with various violations of the Interstate Commerce Act, including specially the agreement for "routing," hereinafter set forth, and asked the Commission to enjoin such companies from any further violation of the act. The companies put in answers to the petition, denying its material averments. Testimony was then taken before the Commission, and the following, among other facts, were shown:

The through tariff of rates from California to the East, with the right of routing, which had been agreed upon between the companies complained of (hereinafter called the initial carriers) and their eastern connections regarding the oranges and other citrus fruit transportation was in force January 1, 1900, and these proceedings were commenced February 26, 1900. Before the adoption of the rule for routing there had been among the eastern connections of the initial carriers under the through joint tariff rates then existing, the greatest rivalry to obtain the California fruit freight business, and this rivalry led, on the part of the connecting carriers, to a system of rebates from the through tariff rates, which was a clear violation of the Commerce Act, and was demoralizing in every way to honest business. Indeed, the president of one of complainants before the Commission admitted that his company (the Southern California Fruit Exchange) had in four years received rebates to an amount of over $174,000. The practice had become so general that the shippers came to regard a rebate as part of the legitimate returns from the orange business. Among those who participated in this system of rebates were what is termed the car line companies, which were incorporated companies

owning cars in which the fruit was packed, described as ventilator or refrigerator cars, which were peculiarly adapted to the carriage of the fruit, and were hired by the initial carriers because they did not want to own equipment cars which they could keep in service only part of the year, while the car companies could use the cars for other purposes in other parts of the United States when the orange transportation was over. These car companies made arrangements with the connections of the initial carriers east of Chicago and New Orleans, by which a certain bonus, varying from $10 to $40 per car, was given the car line companies, in consideration of the car being routed over the line paying the bonus, a part of the bonus, varying from a quarter to a half, being usually turned over to the shipper by the car company, for the privilege allowed the latter of routing the shipment.

The initial carriers form two systems, one called the Southern Pacific System and the other the Santa Fe System. There are numerous points of junction on these lines of the defendants, where connection is made with other carriers, and at their termini in Chicago, Ogden and New Orleans such connection is made, and through lines are formed over which the citrus fruit is transported to practically all the markets of the United States. The two systems are the only ones which reach the section of country where the orange industry in Southern California exists, and they about equally divide the transportation of the oranges therefrom. The Commission said the evidence was unsatisfactory as a basis for a conclusion whether the initial carriers pooled their citrus fruit traffic or divided the earnings therefrom, and it therefore retained such question for further hearing and investigation.

Prior to January, 1900, the rebates by the eastern companies, already referred to, had become so great and demoralizing that the initial carriers at length determined to try and crush the whole thing. The connecting carriers were themselves dissatisfied with this state of things, but each felt it necessary in order to compete with the others. It had been

assumed that the car line companies were not common carriers, and were not within the Commerce Act, and therefore they were more ready to indulge in the practice of getting rebates whenever they could, and paying part of the amount to the shippers for giving them the right to route the shipment. Prior to the adoption of the through rate tariff with this rule under discussion, the shippers had been permitted by the initial carriers to control the routing of the freight, and also to divert it, en route, from the destination point named in the bill. In order to stop the rebating on these joint through rates it was proposed to agree upon a through rate tariff, to be assented to and accepted by the railroads interested in the fruit transportation, or by as many of them as possible, with the rule in question to form part of the agreement. Such a tariff agreement was made between some of the roads (and subsequently assented to and joined in by most of the roads), and filed with the Commission, for the transportation of oranges and other citrus fruit from Southern California at $1.25 per hundred pounds, to practically all points east of the Missouri River. The tariff agreed upon by the companies contains the rule complained of, which is part of such agreement, and by it the initial carriers agreed to guarantee the through rates to the shipper, but only on the following conditions:

"In guaranteeing the through rate named herein, the absolute and unqualified right of routing beyond its own terminal is reserved to initial carrier giving the guarantee. In accordance with this rule, agents will not accept shipping orders or other documents, if routing instructions are shown thereon. Neither will agents accept verbal routing instructions."

Another rule reads:

"Initial carrier will route each car from point of origin to point of destination, and diversions in transit will not be permitted except by consent of initial carrier, who will thereupon designate new routing when diversion necessitates change therein."

Notwithstanding the rule thus published in regard to rout-

ing, the initial carriers generally thereafter permitted the shippers to route the cars containing their fruit as they desired. The right to divert freight from the destination point or route named in the bill of lading and before the freight reached the billed destination, had been exercised generally by shippers, and had been allowed by the carriers throughout the country, and the practice was regarded of value to the shippers, as it enabled them sometimes to realize higher prices than they otherwise might if the freight were continued to the original destination. This diversion by the shippers also continued to be generally allowed.

The reason for the rule, reserving to the initial carrier this right to route the traffic, is stated to have been because it enabled the initial carriers to secure the discontinuance of the practice of paying rebates. Since the adoption of that rule the rebates which had been paid to shippers and to owners of car lines were discontinued, and the Commission says there is no evidence that the practice has been resumed. They were discontinued for the obvious reason that the shippers could not control the route, and hence it would be useless for the eastern railroad company to pay the shippers or the car line companies rebates on freight the eastern company might not receive and which the initial carrier alone had the routing of. As soon as the routing was agreed upon and the through tariff rates fixed, the eastern connections had to do business with the initial carriers instead of the car company or the shipper. The shippers prepay or guarantee freight charges to destination. The initial carrier does not assume liability from damage resulting from negligence of any connecting line.

The Commission (the chairman, Mr. Commissioner Knapp, dissenting) ordered the defendants to cease from exacting from the shippers the right to themselves make the route which the freight should take. The ground taken by the Commission was that such routing by the initial carriers subjected the shippers to undue, unjust and unreasonable prejudice and disadvantage, and gave to the carrier an undue and unrea-

sonable preference and advantage, and was a violation of the third section of the act.

The initial carriers, believing the Commission had erred in its decision, refused to obey the order which it made, and thereupon the Commission, pursuant to the sixteenth section of the act, filed its bill in the Circuit Court for the purpose of enforcing its order.

The bill thus filed by the Commission was demurred to by the defendants, and the demurrer was overruled. 132 Fed. Rep. 829. The railroad companies then answered, and the case, after the taking of further evidence, came up for final hearing, when the order of the Commission was affirmed and directed to be enforced (132 Fed. Rep. 829), although the Circuit Court put the affirmance on the ground that the agreement as to routing showed that there was a violation of § 5 of the Commerce Act, in that such agreement amounted to a contract or combination for the pooling of freights. The court passed upon no other question raised in the case. A very full statement of facts is contained in the report in 132 Fed. Rep. *supra.*

A motion was made for a supersedeas pending the hearing of this appeal, which, for the reasons stated in the opinion of the Circuit Court, was denied. 137 Fed. Rep. 606.

*Mr. Robert Dunlap,* with whom *Mr. Thomas J. Norton* and *Mr. Gardiner Lathrop* were on the brief, for appellants, Southern California Railway Company, Atchison, Topeka & Santa Fe Railway Company, and Santa Fe Pacific Railroad Company. *Mr. Maxwell Evarts,* with whom *Mr. Robert S. Lovett* was on the brief, for appellant, Southern Pacific Company:

This is a special proceeding in which the jurisdiction of the Circuit Court is confined to determining the lawfulness of the order of the Commission, and if found to be lawful to enjoin obedience thereto, otherwise to dismiss the bill. Sec. 16, pp. 3165, 3166; 3 U. S. Comp. Stat. If the Commission have misconstrued or misapplied the provisions of this law their order is invalid. *Int. Com. Com.* v. *L. V. R. R. Co.,* 74 Fed. Rep. 784;

*D. G. H. & M. R. R. Co.* v. *Int. Com. Com.*, 74 Fed. Rep. 803; *Int. Com. Com.* v. *D., L. & W. R. R. Co.*, 64 Fed. Rep. 723; *East Tenn. &c. R. R.* v. *Int. Com. Com.*, 181 U. S. 1.

The facts found by the Commission were insufficient to warrant its conclusions and orders and it is therefore evident that the Commission erred in applying the law to the case before them. *L. & N. R. R.* v. *Behlmer*, 175 U. S. 674–676.

The evidence in the lower court showed that the conclusion of the Commission concerning the adoption of the routing provision in the joint tariff was erroneous and its order based upon such conclusion is therefore invalid. The report of the Commission shows that it misconstrued and misapplied sec. 6 in holding that carriers could not impose as a condition for the making of joint tariffs the right of the initial carrier in any event to route shipments under such joint rates.

The supposed right of the shippers to route is neither recognized nor protected by the Interstate Commerce Law and therefore the assertion of such right to route in the initial carrier contrary to the wishes of shippers is not "something done or omitted to be done in violation of the provisions" of that law or any other law cognizable by the Commission. *Wannan* v. *Scottish Central R. Co.*, 1 Nev. & MacN. 237; *Bennett* v. *Manchester, &c. Ry. Co.*, 6 C. B. (N. S.) 707.

The shipper is at liberty to ship under the joint tariffs and the rates therein prescribed, or not, as he may please,—it is always optional with him to do so. It is simply insisted that where he does make a through shipment under a joint rate, which is lower than the sum of the locals, he ship and accept such lower rate upon the condition on which it is made by the agreement of the carriers and thus offered him.

If he does not like this condition he is not obliged to accept the same, but may ship at the sum of the locals, and the routes or lines are just as continuous for shipment or carriage in the one case as in the other.

The joint rate is the through rate where the initial carrier routes, and the sum of the locals is also a through rate where

the shipper routes. A through rate may be the one thing or the other—a joint rate fixed by agreement of connecting carriers, or the sum of the locals. Opinion of Lord Esher, in *Didcot &c. Ry. Co.* v. *Great Western &c. Ry. Co.*, 10 Ry. & Canal Traffic Cas. 5.

The power of the Commission in respect to such joint tariffs is very clearly defined in the statute. It has no power to prescribe what shall or shall not be contained in the joint agreements, nor what the provisions thereof shall be. *Interstate Com. Com.* v. *Railway Company*, 167 U. S. 504, 505.

There is a marked difference between this law which intentionally omitted giving the Commission power to make provisions concerning joint tariff rates, and the Minnesota statute which invested the Railroad Commission of that State with specific power over such tariffs, and which was considered by this court in *Minneapolis &c. Ry.* v. *Minnesota*, 186 U. S. 257.

With the exception of requiring joint agreements to be filed and published, the law leaves the carriers as free as they were at common law to determine the terms and conditions of such joint contracts. This view was taken by Mr. Justice Jackson in *Kentucky Bridge Co.* v. *L. & N. Ry. Co.*, 37 Fed. Rep. 629.

There ought to be a clear authority found in the statute for depriving the carrier of this important right before the authority is exercised, for when questions of that nature have to be solved, a great variety of complex considerations will present themselves, some of which can neither be foreseen nor stated. *Little Rock &c. R. R. Co.* v. *St. Louis &c. Ry. Co.*, 63 Fed. Rep. 780; *Interstate Com. Com.* v. *B. & O. R. R. Co.*, 43 Fed. Rep. 37 (Mr. Justice Jackson), approved in *Cincinnati &c. Ry. Co.* v. *Interstate Com. Com.*, 162 U. S. 197. See also *Int. Com. Com.* v. *Alabama Midland Ry. Co.*, 74 Fed. Rep. 723; *Int. Com. Com.* v. *Western & A. R. Co.*, 93 Fed. Rep. 91; *Int. Com. Com.* v. *Western & A. R. Co.*, 88 Fed. Rep. 196; *Nicholson* v. *Great Western Ry. Co.*, 7 C. B. (N. S.) 755.

At common law the appellants could route through freight

beyond their own terminals and they have not been deprived of such right by the Interstate Commerce Act.

The principle is that a carrier when it agrees to transport freight beyond its own lines does so not as a common carrier, but under an independent contract governed by the same rules that any contract is controlled by. Under the common law, therefore, it is clearly open to a carrier, which has contracted to carry beyond its own lines, to select the agency through which to perform the contract made by it with the shipper. *Atchison, Topeka & Santa Fe R. R. Co.* v. *Denver & New Orleans R. R. Co.,* 110 U. S. 667; *Louisville &c. R. R. Co.* v. *West Coast Stores Co.,* 198 U. S. 483; *Snow* v. *I. B. & W. R. Co.,* 109 Indiana, 422, 425; *C. I. & L. R. Co.* v. *Woodward,* 72 N. E. Rep. 558 (Supreme Court of Indiana, 1904); *White* v. *Ashton,* 51 N. Y. 280, 284; *Hinckley* v. *N. Y. C. & H. R. Co.,* 56 N. Y. 429; *Indiana R. R.* v. *Remy,* 13 Indiana, 518; *Patten* v. *U. P. R. R.,* 29 Fed. Rep. 591; *Post* v. *Southern Ry. Co.,* 103 Tennessee, 220; *Lowe* v. *Seaboard Air Line Ry. Co.* (S. C.), 41 S. E. Rep. 297.

Neither the Commission nor the court could make a different agreement or contract for these carriers than the one made by such carriers and the attempt of the Commission to keep in force the joint rate and strike out the condition or consideration therefor would be equivalent to making a new agreement for the parties which they did not desire to make. *Little Rock &c. R. R.* v. *St. Louis &c. R. R.,* 63 Fed. Rep. 779, 780; *Southern Pacific Co.* v. *C. F. & I. Co.,* 101 Fed. Rep. 779, 786; *Little Rock &c. R. R.* v. *St. Louis &c. R. R.,* 41 Fed. Rep. 559; *Pullman Car Co.* v. *Mo. Pac. Ry.,* 115 U. S. 587; *A., T. & S. F. Ry.* v. *D. & N. O. R. R.,* 110 U. S. 682, 683; *Express Cases,* 117 U. S. 1, 29.

Any interference with the supposed right of a shipper to divert his shipment while in transit would not be in violation of the Interstate Commerce Law. Diversion of this traffic, as practiced by the shippers is merely a privilege or concession granted by the carriers, but to which the shipper is not en-

titled as a matter of right. *Ellis* v. *Willard,* 9 N. Y. 529; *Violett* v. *Stettinius,* 5 Cranch. (C. C.) 559; *S. C.,* 28 Fed. Cas. No. 16,953; *Braithwaite* v. *Power,* 48 N. W. Rep. 354; Hutchinson on Carriers, 2d ed., § 444*a.*

Section 5 of the Interstate Commerce Act does not prohibit a mere division of traffic between connecting lines, even if competitive. It only concerns agreements for a division of receipts or earnings which are to be combined or pooled and afterwards distributed upon an agreed proportion or ratio. Sec. 5 Interstate Commerce Law; *United States* v. *Trans-Missouri Freight Association,* 58 Fed. Rep. 65.

To justify a finding of undue preference either as between shippers or traffic it must be shown that they come in competition with each other so that injury results to the one by reason of the preference given the other. *Int. Com. Com.* v. *B. & O. R. R.,* 43 Fed. Rep. 37; *United States* v. *C. & N. W. Ry.,* 127 Fed. Rep. 785; *Hozier* v. *Caledonian Ry.,* 1 Nev. & MacN. 27; *Int. Com. Com.* v. *B. & O. R. R.,* 145 U. S. 282, 283, 284; *Nicholson* v. *Great Western Ry.,* 1 Nev. & MacN. 150; *Lees et al.* v. *Lancashire &c. R. R.,* 1 Nev. & MacN. 352, 366; *Nicholson et al.* v. *Great Western Ry.,* 1 Nev. & MacN. 121; 1 Railway and Canal Traffic, Boyle & Waghorn, 158, 159; *Phipps et al.* v. *London & N. W. R. R.,* Law. Rep., Q. B. Div., 1893, vol. 2, p. 236.

The order of the Commission is too broad to be supported upon the ground that an undue preference might be made by the carrier or upon the ground that the routing provision was adopted to effectuate a division of traffic between connecting carriers. The order is not responsive to or confined to any findings in the case upon the points stated in the report of the Commission and is therefore unlawful. *D. G. H. & M. R. R.* v. *Int. Com. Com.,* 74 Fed. Rep. 803, 840, 841; *East Tenn. R. R.* v. *Int. Com. Com.,* 181 U. S. 1, 23, 26. It is unlawful because legislative in its nature. It is not confined in favor of the complainants nor to the case before the Commission but it is intended generally to control the conduct

of the carriers in all future cases and controversies and is such an order as the Commission has no authority to make. *Int. Com. Com.* v. *C., N. O. &c. R. R.*, 76 Fed. Rep. 184; *Farmers' L. & T. Co.* v. *Nor. Pac. R. R.*, 83 Fed. Rep. 268; *Int. Com. Com.* v. *Railway Co.*, 167 U. S. 501; *Int. Com. Com.* v. *Alabama &c. R. R.*, 168 U. S. 161, 162; *Texas & Pac. R. R.* v. *Int. Com. Com.*, 162 U. S. 216.

The order was invalid because the connecting carriers were not made parties to the proceedings before the Commission and the Commission had no power to adjudicate the provision in the joint tariff agreement to be invalid without having before it the connecting carriers who were parties to that agreement and giving them an opportunity to be heard thereon. A court of equity could not entertain jurisdiction in such a contingency, neither could the Commission make an adjudication or order declaring invalid the joint tariff agreement and thus affecting rights of parties who were not before the Commission. *California* v. *So. Pac. Co.*, 157 U. S. 229, 249, 251; *United States* v. *Nor. Pac. R. R. Co.*, 134 Fed. Rep. 715 (C. C. A., 8th Circuit); *Minnesota* v. *Nor. Sec. Co.*, 184 U. S. 199; *Cons. Water Co.* v. *City of San Diego*, 93 Fed. Rep. 849, 852; *Western N. Y. R. R.* v. *Penn. Refg. Co.*, 137 Fed. Rep. 358.

*Mr. Joseph H. Call*, Special Assistant to the Attorney General, and *Mr. Llewellyn A. Shaver*, Solicitor for the Interstate Commerce Commission, for the Commission:

This case is not within the rule of the common law.

The defendants base their alleged right to make this rule upon the right of routing as they claim it exists at common law, and contend that at common law the right was absolutely in the carrier to select his own route, his own instrument, his own agent, in shipping beyond his own line.

.This is not true absolutely. It is only true where the initial carrier assumes the common law liability of a common carrier beyond its own line and on the lines of its connections. At

common law a common carrier is in the nature of an insurer against damage or loss of goods during the carriage on its own line from any cause except the act of God or the public enemy. 2 Redfield, Law of Railways, 6; Chitty on Contracts, 6th Am. ed., 181. And the common law rule giving the initial carrier the right to route the traffic beyond its own line only applies where the initial carrier practically extends its own line and becomes a common carrier with common law liability over the entire route.. The cases cited by counsel for defendants are of that character. See *Atchison &c. R. R. Co. v. Denver & N. O. R. R. Co.*, 110 U. S. 667, 680.

A further distinction between the case at bar and the cases cited in behalf of the defendants is the fact that the case at bar is controlled by the provisions of the act to regulate commerce.

In the opinion in *Atchison, Topeka & Santa Fe R. R. Co. v. Denver & New Orleans R. R. Co.*, 110 U. S. 667, this court recognizes that even where a carrier has contracted to carry beyond his own line, and therefore has the right at common law to select the route, this right only exists in the "absence of statutory regulations to the contrary"—the language of this court being that "if he (the carrier) contracts to go beyond his own line, he may in the absence of statutory regulations to the contrary, determine for himself what agencies he will employ."

The routing rule of defendants is inconsistent with and contrary to the spirit, if not the letter, of section 6 of the Commerce Act.

The routing rule gives an undue preference and subjects to an undue prejudice in violation of section 3 of the act to regulate commerce.

Preferences or prejudices may be in respect to rates or routing or facilities or any other matter as to which a preference can be given or a prejudice inflicted, and therefore the statute, in order to cover every form of preference or prejudice, uses the all-embracing words "in any respect whatsoever."

The connections of the defendants and the lines established by them beyond their own lines differ as to desirability. Some of these connections are better built, better managed and operated, and more reliable financially than others, and some of the lines are shorter and freer from risk than others and more desirable in other particulars. Hence, while the rate by all is the same, there is a choice between them, and the shippers of all traffic except citrus fruit are allowed to avail themselves of this choice. The citrus fruit traffic is the only kind of freight as to which the defendants deny to shippers the right of choice of route. This clearly gives to other traffic and the shippers thereof an undue preference, and subjects citrus fruit to an undue prejudice.

The defendants concede to shippers of citrus fruit the right to ship over the route of their choice, but if it happens not to be the route of the defendants' choice they require the shippers to pay for the right; in other words, to pay a rate which is the sum of the locals of the several carriers composing the through line, this sum of the locals being much higher than the regularly established and published rate filed with the Interstate Commerce Commission.

Under this regulation the shipper of citrus fruit who chooses a route other than that selected by the initial carrier pays a higher rate than the shipper of the same kind and quantity of citrus fruit between the same termini for whom the carrier has selected the route in question. In both cases the carrier's risk and service are precisely the same and the traffic of both shippers may be on the same train, but a higher rate is exacted from the one than from the other.

This results in violation of §§ 1, 2, 5 and 6 of the Interstate Commerce Act and also §§ 1 and 7 of the anti-trust act. *Wight* v. *United States*, 167 U. S. 512; *King* v. *Railroad Company*, 4 I. C. C. R. 262; *Augusta Southern R. R. Co.* v. *Wrightsville & Tennville R. R. Co.*, 74 Fed. Rep. 527; *Minneapolis & St. Louis R. R. Co.* v. *Minnesota*, 186 U. S. 262; *Chicago &c. R. R. Co.* v. *Tompkins*, 176 U. S. 167; *United States* v. *Trans-*

*Missouri Freight Assn.*, 166 U. S. 290; *Swift & Co.* v. *United States*, 196 U. S. 375.

The routing rule is essential to and adopted and used for the purpose of carrying out a pooling or division of traffic arrangement between the defendants; it is therefore unlawful under section 5 of the act to regulate commerce.

It is no excuse for one violation of law that it incidentally puts a stop to another.

Without the power of routing the traffic could not be pooled. If shippers route the traffic it will necessarily render pooling by the carriers impracticable. *Port* v. *Southern Railroad Co.*, 103 Tennessee, 220, distinguished.

Objection to want of other parties was waived by failure to plead their names and show necessity of joining. *Carey* v. *Brown*, 92 U. S. 171, 173; *Florence Machine Co.* v. *Singer*, 8 Blatch. 113; *S. C.*, Fed. Cases No. 4,881; *Sheffield* v. *Newman*, 77 Fed. Rep. 787, 791 (C. C. A.); Equity Rules, 52, 53.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

Although there are separate proceedings in these various cases, the question arising in all is identical and the cases will hereafter be spoken of as if there were but one proceeding before the court. The single question presented is, has the carrier that takes the fruit from the shipper in California the right, under the facts herein, to insist upon the rule permitting such carrier to route the freight at the time it is received from the shipper?

The Commission has decided that the carrier has not the right, and that the rule denies to shippers the use of their transportation facilities, which such shippers are entitled to, and that in its application, by the initial carriers to the fruit traffic, the shippers are subjected to undue, unjust and unreasonable prejudice and disadvantage, and the carriers are given an undue and unreasonable preference and advantage.

If this be the necessary effect of the rule, it may be assumed to be a violation of section 3 of the Interstate Commerce Act, and the Commission, therefore, rightly ordered the carriers to desist from observing it.

By section 16 of the act, the Circuit Court is given authority to enforce "any lawful order or requirement of the Commission." If the order be not a lawful one, the court is without power to enforce it. Whether or not such order was lawful is the matter to be determined.

The Commission does not find that any contract existed between the initial carrier and its eastern connections to bill the fruit according to certain proportions among the connecting railroads. The Commission said:

"The situation warrants the inference, however, that these two initial carriers or systems, connecting with other carriers at various points, and they in turn connecting with numerous other carriers, as shown by the tariff, are able by acting in concert, and routing as they see fit, to only send traffic over the roads of such carriers as fulfilled an agreement to refrain from making any rate concession to the shippers, and some influence of like character could doubtless be exerted by them upon the car lines which are also hereinafter referred to."

Such statement simply shows that if any eastern railroad, with which an agreement for joint through rates existed, should give rebates on the joint through rate tariff, thus carrying freight below the rates agreed upon as the through rate tariff, that road would not get the freight.

We see nothing in the initial carrier endeavoring to maintain the rates agreed upon as a through rate tariff, and thereby preventing the payment of rebates, which in itself is a violation of the act. The act especially prohibits, in the sixth section, any alteration of the rates agreed upon, in favor of any person or persons. There is no finding that there has in fact, as a result of the rule, been any discrimination or unjust action as between the initial carriers and the shippers themselves, and there is no evidence that any was ever practiced.

In the examination of the rule it is well to bear in mind the situation of the companies and the business at the time of its adoption. It is fully set forth in the foregoing statement of facts. The payment of the rebates was a shame and was in truth unsatisfactory to all the railroads, besides being plainly a violation of the Commerce Act.

We think there is nothing in the act which clearly prohibits the roads from adopting the rule in question. The decision turns upon the construction of a statute which at least does not in terms prohibit.

In cases such as this a court is bound to consider the bearing of the result of either construction upon the general purposes of the act. In enacting the Commerce Act this court has stated that the object of Congress was to facilitate and promote commerce by the adoption of regulations to make charges for transportation just and reasonable, and to forbid undue and unreasonable preferences or discriminations. *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S. 197.

The importance of the rule in this case, so far as the shipper is concerned, is not so great as is its importance to the railroads in preventing rebates. If the right of routing be looked at alone, without any connection with the claimed right of diverting the freight, the rule itself would be generally of little importance to the shipper. In all probability the freight gets to its destination when routed by the carrier as early as if routed by the shipper, and in that event the particular route taken is not very important to the latter. The evidence before the Circuit Court shows that the routing, when done by the carrier, was fairly apportioned among the eastern connections, having an eye to good service and expedition, and the roads that the routing was done over were the best roads in the country; the roads that have been eliminated were the roundabout roads; there were no roads that were insolvent, so far as known by the witnesses. Now, as the fact appears that the actual routing is generally conceded the shipper, and also his request for a diversion allowed, there is nothing in the mere

right of routing by the companies, separate from other facts, of which the shipper can properly complain. The Commission says it does not distinctly appear in testimony that a delivery by a particular terminal road has been denied in any particular case, yet the manifest evil results of an arbitrary application of the rule must be considered in determining its legality. If there is no such arbitrary application, we do not agree that the rule itself is to be held illegal, because a violation of the act may be committed, while the evidence is that none in fact was committed. It does appear that the mere existence of the right to route on the part of the company has ended the practice of rebating. But the opportunity to obtain rebates on the part of the shipper is surely not a ground for action by the Commission or by the court. Of course, if in attempting to cut off rebates there is a violation of the act, the act must be followed, and that means of prohibiting them must be abandoned. Courts may well look with some degree of care before so construing a statute, which confessedly does not in terms so provide, as to prohibit such a rule on the ground that it would be a violation of the statute. We are of opinion that the rule is not a violation thereof.

It is conceded that the different railroads forming a continuous line of road are free to adopt or refuse to adopt joint through tariff rates. The Commerce Act recognizes such right and provides for the filing, with the Commission, of the through tariff rates, as agreed upon between the companies. The whole question of joint through tariff rates, under the provisions of the act, is one of agreement between the companies, and they may, or may not, enter into it, as they may think their interests demand. And it is equally plain that an initial carrier may agree upon joint through rates with one or several connecting carriers, who between each other might be regarded as competing roads.

It is also undoubted that the common carrier need not contract to carry beyond its own line, but may there deliver to the next succeeding carrier and thus end its responsibility,

and charge its local rate. for the transportation. If it agree to transport beyond its own line, it may do so by such lines as it chooses. *Atchison &c. R. R. Co.* v. *Denver &c. R. R. Co.*, 110 U. S. 667; *Louisville & Nashville R. R. Co.* v. *West Coast Naval Stores &c. Co.*, 198 U. S. 483. This right has not been held to depend upon whether the original carrier agreed to be liable for the default of the connecting carrier after the goods are delivered to such connecting carrier. As the carrier is not bound to make a through contract, it can do so upon such terms as it may agree upon, at least so long as they are reasonable and do not otherwise violate the law. In this case the initial carrier guarantees the through rate, but only on condition that it has the routing. It was stated by the late Mr. Justice Jackson of this court, when Circuit Judge, in the case of *Texas &c. R. R. Co.* v. *Interstate Commerce Commission*, 43 Fed. Rep. 37, as follows:

"Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits."

This statement was approved by this court in *Cincinnati &c. R. R. Co.* v. *Interstate Commerce Commission*, 162 U. S. 184, 197.

Having this right to agree on a joint through tariff on terms mutually satisfactory, we cannot find anything in the Commerce Act which forbids the agreement with such a condition therein as to routing. It is said that the sixth section, properly construed, prohibits such condition. We confess our inability to find anything in that section which does so.

The fact that the rate, when agreed upon, must be filed with the Commission and made public by the common carriers when directed by the Commission, does not prevent the adoption of an agreement for a through rate tariff with the condition as stated. Nor does the provision granting power to the Commission to prescribe forms of schedules of rates, as provided for in the sixth section, have any such effect. Where there is an agreed through rate tariff, and as part of such agreement, which is joined in by several railroads, the right to route cars is reserved to the initial carrier, we do not think that the shipper, by virtue of the sixth section, has the right to ignore the condition which is part of the agreement under which the through rate is made and is guaranteed.

We cannot see that the rule violates the third section of the act. All the facts referred to by the Commission are nothing but statements as to how, under such a rule, there might occur a violation of that section, but we find nothing in the facts stated by the Commission, showing that such violation had occurred. In truth, the companies did not always even enforce the rule, still less did they discriminate against shippers or in favor of carriers. On the contrary, the Commission stated that "while the initial carriers do not always route as requested by the shippers, they generally comply with their request." The mere failure to do so does not, however, prove a violation of the section.

The right to route is also complained of because the rule confined it to the fruit business, and therefore it was, as contended, a discrimination against those engaged in it or against the traffic itself. The transportation of this fruit is a special business, large interests are involved in it, and particular pains are taken to transport it as speedily as possible. With regard to all other freight it has substantially nothing in common. The cases are wholly unlike, and there has been no proof or complaint as to rebates being given in connection with other freight, and the witnesses for the railroad state if there were any evidence or complaint of such rebates, the same rule as to

routing would be immediately adopted. As has been said, there is no pretense of discrimination under this rule between the shippers of freight themselves. There seems to be unanimous agreement that all shippers are treated alike and are granted the same privileges, and the routing is generally accorded them. It is the power to route, which rests with the initial carrier, that really takes away the motive for a rebate in the manner indicated, and, therefore, the granting of the request of the shipper as to a particular route may be, and is, generally conceded without danger that the rebate business may be again practiced.

The important facts that control the situation are that the carrier need not agree to carry beyond its own road, and may agree upon joint through tariff rates or not, as seems best for its own interests. Having these rights of contract the carrier may make such terms as it pleases, at least so long as they are reasonable and do not otherwise violate the law. We think the routing rule is not unreasonable under the facts herein and that it does not violate the third section of the act.

Because opportunities for the violation of the act may occur, by reason of the rule, is no ground for holding as a matter of law that violations must occur, and that the rule itself is therefore illegal. We are, consequently, unable to concur in the view taken by the Commission that the rule violates the third section of the act.

Upon the proceeding before the Circuit Court, that court did not pass upon the question decided by the Commission, but held that the routing rule agreed to between the initial carrier and the various eastern companies, and forming a part of the subsequent joint through tariffs which were filed with the Commission, was in itself a contract or combination for the pooling of freights.

The defendants object that the Circuit Court had no authority to decree the enforcement of the order upon any other ground than that taken by the Commission itself. We think that the court was not confined to those grounds, and if it

found the rule was, in itself, for any reason illegal as a violation of the act, the order might be valid and be a lawful order, although the Commission gave a wrong reason for making it. If it held that the rule to be a violation of one section, the order to desist might be valid, if, instead of the section named by the Commission, the court should find that the rule was a violation of another section of the act. All the facts being brought out before the Commission or the court, the court could decide whether the order was a lawful one, without being confined to the reasons stated by the Commission. We therefore look to see the ground taken by the Circuit Court.

That court found that the rule was adopted to uphold their published rates, or in other words to maintain the rates on the joint through tariff. Although, under the previous through rate tariff, these rates had been secretly cut by the eastern connections of the initial carriers, yet when the routing rule was agreed to as part of the through rate tariff these rebates ceased. Hence, as the court said, the purpose of the rule was undoubtedly to maintain the through rate tariff, and that it was effectual. But the court held, as a result, that this routing provision, being part of the through rate tariff, agreed to by the various eastern roads, made a contract among those roads for the pooling of freights on competing railroads within the meaning of section 5 of the Commerce Act. It held that it was not necessary in order to form a pool, in violation of that section, that the contract or agreement should fix the percentages of freight the several railroads were to receive, or that the railroads should know in advance what the percentages should be; that it was sufficient to constitute a pool if the contract or agreement provided for special means or agencies for apportioning freights, which would destroy the rivalry which would otherwise exist between the competing railroads; and an agreement by which the apportionment was left to the will of the initial carrier accomplished that purpose as effectually as though definite percentages were fixed in the contract; that defendants' plan to maintain through rates

through the operation of the routing rule necessarily destroyed competition, and the adoption of the routing rule put the shippers in a position where their patronage could not possibly be competed for by the defendants' eastern connections.

Thus the mere fact that the initial carrier was granted by this through tariff agreement the right to route the freight was held to result in the formation of a pool, in violation of the fifth section of the act. There was no other agreement proved in the case. It is stated by the Commission that the shipments are forwarded by the initial carrier so as to give certain percentages of the traffic to connecting lines. At the same time the Commission finds that initial carriers generally comply with the requests of the shippers to route the freight as desired. The substance of the report of the Commission is, therefore, that there is a certain percentage of the traffic given the connecting carriers when there is no request for routing given by the shippers. It amounts to the giving of fair treatment to the connecting carriers. It is true the Commission calls this a tonnage pool between the connecting carriers, to which the initial carriers give effect by their routing arrangement, and that its object was not so much to prevent rebates, which was but an incident, as to effect the tonnage division. We are of opinion, however, that the evidence is substantially one way, and that is that the arrangement for routing was to break up rebating, and that it has been accomplished. The evidence before the Circuit Court was to the effect that there was no agreement whatever with the eastern connections that any of them should have any particular proportion of the freight, but the eastern roads entered into the routing agreement because they were satisfied that it would be better than the then present practice of rebating, and they thought that they would get a fair share of the business, or, in other words, would be fairly treated by the initial carriers, who gave them to understand that they would be so treated. The tonnage pool was, as the witnesses said, a myth, and it was testified to that there was not one of the eastern

companies that knew what percentage of the whole business that company secured. They simply knew that the through rates were maintained under the operation of the routing agreement and that rebating ceased, and they were satisfied with the manner of their treatment by the initial carrier.

The Circuit Court, in order to arrive at its result, necessarily treated the connecting carriers as rival and competing transportation lines for this freight, and assumed that between these lines there would exist, but for the routing agreement, a competition for the fruit transportation which could not be extinguished by any agreement as to routing, as a condition for making through tariff rates; that as competition was destroyed by this rule, it was idle to say that such result was not intended by the defendant, and so it was held that the carrying out of the routing agreement violated the act.

We think these various roads were really not competing roads within the meaning of the fifth section of the Commerce Act, when the facts are carefully examined. That act recognizes the right of the carriers to agree upon and provides for the publication of joint through tariff rates between continuous roads, on such terms as the roads may choose to make, provided, of course, the rates are reasonable and no discrimination, or other violation of the act is practiced. The initial carrier did not, on its line, reach the eastern markets, but it reached various connecting railroads which did reach those markets. The initial carrier had the right to enter into an agreement for joint through rates, with all or any one of these connecting companies, though such companies were competing ones among themselves. And the agreements could be made upon such terms as the various companies might think expedient, provided they were not in violation of any other provision of the act.

Prior to the adoption of the routing rule these connecting railroads were already acting under a through rate tariff which continued up to the time when the agreement for the routing was adopted. When so acting it was no longer possible to

compete with each other as to rates (and it is upon the rebates as to rates that this whole controversy is founded), provided the companies fulfilled their joint rate tariff agreements. The only way the rate competition could exist under the through rate tariff was by violating the law. This, unfortunately, was habitually done, and during that time the competition consisted in a rivalry between these roads, as to which would be the greatest violator of the law by giving the greatest rebates.

In truth, the only way in which these connecting lines could legally become competing railroads for this California fruit trade would be in the absence of all joint tariff rate agreements. The moment they made such agreements, and carried them out, rate competition would cease.

All that would be needed for the total suppression of rate competition among the connecting railroads would be the honest fulfillment of their agreement as to joint through rates. And just here is where they failed and where they violated their agreement and the law by granting rebates, or, in other words, by competing, as to rates, for the freight in violation of the joint rates. In such case we do not see any violation of the pooling section of the act, by putting in the agreement for joint through rates the provision for routing by the initial carrier. It achieved its purpose and stopped rebating, although it thereby also stopped rate competition which, in the presence of the through rate tariff, was already illegal. The railroads are no longer rate competing roads after the adoption of a through rate tariff by them, and they have no right to privately reduce their rates.

Now, while the most important, if not the only, effect of the routing agreement is to take away this rebating practice, and to hold all parties to that agreement as part of the joint through rate tariff, we think no case is made out of a violation of the pooling provision in the fifth section of the act, even where the initial carrier promises fair treatment to the connecting roads, and carries out such promises.

We must remember the general purpose of the act which is,

as has been said, to obtain fair treatment for the public from the roads, and reasonable charges for the transportation of freight and the honest performance of duty, with no improper or unjust preference or discrimination.   Under such circumstances, the court ought not to adopt such a strict and unnecessary construction of the act as thereby to prevent an honest and otherwise perfectly legal attempt to maintain joint through rates, by destroying one of the worst abuses known in the transportation business.   The effort to maintain the published through joint tariff rates is entirely commendable.

We think that the agreement in question, upon its face, does not violate any provision of the Commerce Act, and there is no evidence in the case which shows that in fact there has been any such violation.

The decree of the Circuit Court is reversed and the case remanded with instructions to dismiss the bill.

*Reversed, etc.*