Argued November 24, decided December 9, 1913.

# SCHANEN-BLAIR CO. *v.* SOUTHERN PAC. CO.

(136 Pac. 886.)

**Carriers—Existence of Relation—Effect of Contract.**

1. A carrier cannot, by contract, avoid the performance of its duties as such, if the service in question is one required of it as a common carrier.

**Railroads—Carriage of Goods—Stopping Places.**

2. A carrier cannot be required, in the absence of statute, to stop trains to unload freight or passengers at places other than such as it may choose and hold out as regular stopping places.

**Railroads—Carriage of Goods—Stopping Places.**

3. Though Section 6897, L. O. L., requires a railroad to provide and maintain adequate passenger and freight depots, the legislature has not determined where a common carrier must establish stations, Section 6888 providing that the schedule of rates shall plainly state the places between which passengers and property will be carried, thus leaving it optional with the carrier to determine its stations.

**Carriers—Schedules—"Point"—"Directly Intermediate Point."**

4. A provision in a carrier's schedule of rates, under the heading, "Intermediate Application," that the rates will apply to directly intermediate points does not mean that the rates apply to localities between stations; the word "points" referring to stations, and "directly intermediate points" to parts of the schedule in which only a part of the stations are named.

**Carriers—Regulation—Rates.**

5. A carrier, having no siding or stopping place at a point where a patron desired to have stone hauled for a building in the course of erection, was entitled to demand extra compensation before undertaking the service, and is not subject to a penalty though the rate charged is greater than that fixed in its schedule for the station next beyond the point of delivery.

From Multnomah: ROBERT G. MORROW, Judge.

Department 2.    Statement by MR. JUSTICE EAKIN.

This is an action by the Schanen-Blair Company, a corporation, against the Southern Pacific Company, a corporation, to recover $94.71, alleged to be an excessive freight charge, together with treble the amount thereof as damages, under Section 6934, L. O. L.    It

appears that plaintiff was erecting the county court-house building on Fourth Street, between Salmon and Main Streets, in the City of Portland, and had transported by the defendant's cars from its Park Street Station to said building 946.4 tons of stone, or 35 carloads, for which defendant charged and was paid by plaintiff 50 cents per ton, amounting in the aggregate to $473.26, which it is alleged was $94.71 in excess of the rate therefor, as the published tariff governing charges for transportation to the next nearest station fixed the rate at 40 cents per ton.

Defendant, by its amended answer, after certain denials alleges that the defendant, at the times mentioned, was operating a line of railroad from Park Street Station, running thence southerly along Fourth Street to the south boundary of the city, and elsewhere; that its first station south of Park Street Station is known as South Portland Station, and that defendant did not maintain, nor have, a station between said Park Street Station and South Portland Station; that it was not, as a common carrier, required to receive or deliver freight at any point between Salmon and Main Streets in said city; that it did not then have any tariff rates in effect, and was not required to publish or put into effect any rate to said building on Fourth Street, between Salmon and Main Streets. Subdivision 2 of the answer, among other things alleges: "That during the period of time mentioned in plaintiff's complaint, plaintiff was and had been engaged in the construction of that certain building located on Fourth Street, between Salmon and Main Streets, in the City of Portland, county of Multnomah, State of Oregon, and that said building was being constructed for and on account of the county of Multnomah, under the supervision and direction of the county judge and county commissioners of said county. That at or about the time mentioned in said complaint, this plain-

tiff needed various amounts of stone material to be used in the construction of said building, and that at or about the time mentioned in said complaint the aforesaid county officials, together with this plaintiff, requested defendant to transport the stone mentioned in said complaint, from its Park Street Station in said city, along Fourth Street up to said building.    That at the times mentioned in plaintiff's complaint, and for some time prior thereto, this defendant did not have, nor has it since had, any station or facilities, at said Salmon and Main Streets, to unload and deliver stone or other freight, and that at all the times mentioned in said complaint, and for some time prior thereto, said county officials and said plaintiff were fully aware of the fact, and knew that the defendant did not maintain any station between said Salmon and said Main Streets, on said Fourth Street, and did not receive and discharge freight at said point, and did not perform any services as a common carrier from said Park Street Station to said place, and was not required so to do, and then and there well knew and understood that the delivery of the stone mentioned in plaintiff's complaint, or any other article of freight, if undertaken by the defendant, would be undertaken as a private carrier, and would necessitate and require that the defendant should perform a special switching service between said Park Street Station and said point on Fourth Street between Salmon and Main Streets, and would require this defendant to place in said service extra men to handle the same.    That thereupon and thereafter, pursuant to said request, the plaintiff and the defendant made and entered into an agreement for the accommodation of the plaintiff, whereby the defendant agreed to transport, during the nighttime, said stone from said Park Street Station to said courthouse building on said Fourth Street, between said Salmon and Main Streets, in said city, at the rate

of 50 cents per ton for all the stone so to be transported and carried, as aforesaid, and that the plaintiff then and there undertook and agreed to pay said charge to the defendant, and that pursuant thereto the defendant thereafter so carried and transported said stone and materials. * * That the aforesaid service in so transporting and delivering said stone was at said time, ever since has been, and now is, a special switching service, agreed to be performed by the defendant for the plaintiff, as a private carrier. * * ''

A demurrer to the new matter of the answer was sustained. It was conceded at the hearing in this court that the defendant did not have nor maintain a station at or near the said courthouse, or at any place between Park Street Station and South Portland Station; and the court instructed the jury that the county courthouse was a ''directly intermediate point'' between Park Street Station and South Portland Station within the meaning of the schedule of the tariff freight rates of the defendant, and that the freight rate for stone to South Portland Station was controlling on stone shipped to the courthouse. Defendant offered proof at the trial to establish the facts alleged in the new matter of the answer, which was excluded by the court, and the jury was instructed to disregard it. A verdict was rendered for plaintiff in the sum of $94.71, and the court gave judgment thereon in the sum of $284.13, to include treble damages as provided by Section 6934, *supra.* The defendant appeals.

REVERSED WITH DIRECTIONS.

For appellant there was a brief over the names of *Mr. William D. Fenton, Mr. Ben C. Dey* and *Mr. Kenneth L. Fenton,* with an oral argument by *Mr. William D. Fenton.*

For respondent there was a brief, with an oral argument by *Mr. L. C. Mackay.*

Mr. Justice Eakin delivered the opinion of the court.

1. The contention of the defendant is that in the service rendered to plaintiff it was not acting as a common carrier; that the service rendered was not one required of it as a common carrier, but was properly the subject of contract. It is admitted that the service was rendered under a contract with plaintiff; but plaintiff contends that defendant cannot, by contract, avoid the performance of its duties as a common carrier, which is true if the service was one required of it as a common carrier.

2. That raises the question whether a common carrier can be required to stop trains to unload freight or passengers at places other than such as it may choose and hold out as stopping places. This was the only question involved in *Northern Pacific R. R. Co.* v. *Dustin,* 142 U. S. 492 (35 L. Ed. 1092, 12 Sup. Ct. Rep. 283), a case where the railroad company laid out a town called North Yakima on its own ground, a little north of Yakima City, the county seat of the county in which it is situated, in the State of Washington. It is held by that case that *mandamus* will not lie to compel a railroad company to build a station or to maintain a stopping place, unless there is a specific statutory duty to do so, and a breach of that duty. "To hold that the directors of this corporation, in determining the number, place, and size of its stations, * * can be controlled by the courts by writ of *mandamus,* would be inconsistent with many decisions of high authority. * * Each company in the state has the legal right to locate its own stations, and, so far as statutory regulations are concerned, is not required to use any other." And this principle is conceded by a dissenting opinion in that case, where it is said: "The question is not whether a railroad company can be compelled to build a depot and stop its trains at any

place where are gathered two or three houses or families.'' But the dissent is based upon the ground that for private interests the company built up a new town at the expense of the old, and for this subservience of its public duty to its private interest the court may give redress: See, to the same effect, *Atchison etc. R. Co.* v. *Interstate Commerce Commission* (C. C.), 188 Fed. 229 (200 U. S. 536, 50 L. Ed. 585, 26 Sup. Ct. Rep. 330). In Hutchinson, Common Carriers, Sections 48, 62, it is stated that to constitute one a common carrier in a particular case ''the party must be under such a legal obligation to carry that an action will lie against him for refusal without sufficient excuse.'' And in Elliott, Railroads, Section 1396, provides: ''While a railroad company cannot, by contract or otherwise, change the nature of its public duties or obligations, it may, where it is not under a duty or obligation to the public, contract to perform services in the character of a private carrier of goods or passengers. In other words, where there is a right to refuse to perform the services requested, there is a right to contract for their performance in a different capacity from that which rests upon a railroad company as a public or common carrier.'' This is also held in *Santa Fe Ry. Co.* v. *Grant Bros.,* 228 U. S. 177 (57 L. Ed. 787, 33 Sup. Ct. Rep. 474), in which the case of *Santa Fe etc. Ry. Co.* v. *Grant Bros. Co.,* 13 Ariz. 186 (108 Pac. 467), is reversed on another point. In the former case, in speaking of the rule that a common carrier is not permitted to drop its character and fix its liability by contract, Mr. Justice HUGHES says: ''Manifestly, this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such case, it is dealing with matters involving ordinary considerations of contractual relation; those who choose to enter into engagements with it are not at a disadvantage; and its stipulations, even

against liability for its own neglect, are not repugnant to the requirements of its public service. The rule extends no further than the reason for it. It is apparent that there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things, whose carriage in other circumstances might be within its public obligation": *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 440 (32 L. Ed. 788, 9 Sup. Ct. Rep. 469). And where the railroad company is sued in the capacity of a common carrier, the plaintiff will fail if the evidence shows that the undertaking to carry was as a private carrier: *Chicago etc. R. Co.* v. *Wallace,* 66 Fed. 506 (30 L. R. A. 161, 14 C. C. A. 257). The reasoning of the rule stated in *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397 (32 L. Ed. 788, 9 Sup. Ct. Rep. 469), as to carrying some commodities which it is not its business to carry, is just as applicable to delivery of freight at a place at which it is not its business to deliver.

3. The legislature of this state has not determined where a common carrier must establish stations. By Section 6897, L. O. L., the company is required to provide and maintain adequate passenger and freight depots. Thus if the services given by the company's depots are not adequate for the accommodation of the public, the commission may require that a new depot be established at a place where such necessity requires; but by Section 6888, L. O. L., the schedule of rates provided for "shall plainly state the places upon its line * * between which passengers and property will be carried"—leaving it optional with defendant to determine its stations. This is the extent of the duty in that regard until changed by law. Unless a station is required by the railroad commission at a place where none is named in the tariff schedule, the company is

under no obligation to discharge freight at a point between the stations designated in the schedule.

4. The only other question necessary for consideration is whether the rate schedule of the defendant company requires defendant to discharge freight at localities not mentioned in the schedule, or whether the railroad may, as a private carrier, contract for the delivery of freight between stations without violating the statute or rate schedule. Plaintiff's counsel, as well as the court, rested the case on the construction of the language: "Rates named herein * * will apply to directly intermediate points," contained in "(b) intermediate application," under the general heading, "Application of Rates," on page 13 of the schedule, as meaning that the rates shall apply to all localities between stations. We think that language will not bear such construction. In the first place, the schedule was prepared by the railroad company as a compliance with the statute, and was not prepared by the legislature or the railroad commission, and the defendant would not include anything in it that would appear as a consent to receive freight for delivery anywhere except at its designated stations; secondly, the station index in the freight schedule bears the heading: "Points on Southern Pacific Co. (Oregon lines) (except as shown) from which rates apply"—followed by the names and index numbers of the stations. Thus the schedule refers to the stations as points on the road, and therefore the words "points" in "(b) intermediate application" must be understood to refer to the stations; and the term "directly intermediate points" above quoted, as explained by J. H. Mulchay, the assistant general freight agent of the defendant, has reference to the special commodity rates contained in Section 2 of the schedule, beginning at page 24 and covering about seven pages, and possibly to some

68 Or.—8

other rates in which only certain points or stations are named; there being many intermediate stations to which the rate to the point named will apply. The circumstances of this case show the reasonableness of the contention that defendant rendered the service as a private carrier.

5. There was no siding at the county courthouse building, and therefore the cars containing the stone blocked the main track during the unloading, and the engine and train crew were required to remain with the loaded cars and to promptly remove them. The defendant had the right and did refuse to deliver the stone at the points desired by plaintiff until the contract was made for the payment of extra compensation. It was an unusual and extraordinary service not contemplated by the statute nor by the rate schedule, and was not a violation of the defendant's duties as a common carrier. To make a special contract for the delivery of the stone, it included, not only the haul, but the extraordinary and unusual service.

The court erred in sustaining the demurrer to the amended answer, and also in denying the motion for a judgment of nonsuit.

The judgment is reversed, and the case is remanded to the lower court, with directions to sustain the motion for a nonsuit.    REVERSED WITH DIRECTIONS.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BEAN and MR. JUSTICE MCNARY concur.