### WALLOWER et al. v. UNITED STATES.

District Court, W. D. Missouri. June 22, 1928.

On Final Hearing. March 11, 1929.

J. H. Flanigan and Allen McReynolds, both of Carthage, Mo., for plaintiff.

Roscoe C. Patterson, U. S. Atty., of Kansas City, Mo.

J. Stanley Payne, of Washington, D. C., for Interstate Commerce Commission.

J. H. Grant, of Oklahoma City, Okl., Ray McNaughton, of Miami, Okl., and Robert E. Quirk, of Washington, D. C., for intervening railroad defendants.

Before VAN VALKENBURGH, Circuit Judge, and REEVES and McDERMOTT, District Judges.

PER CURIAM. This action is to enjoin the operation of an order made by the Interstate Commerce Commission, directing plaintiffs to cancel certain proposed schedules theretofore filed with the Commission. The facts are not difficult nor in serious dispute. The law applicable is more difficult.

The plaintiffs are receivers of an electric interurban railway, 42 miles long, running from Joplin, Mo., through the southeastern corner of Kansas, to Picher, Okl. This is lead and zinc country. Hard roads and the motorcar cut heavily into its revenues, and it has undertaken, and by this proceeding is undertaking, to recoup a part of its passenger losses by an increase in its freight business. Chartered to do a general railroad business, it has always done some small package business, and in the last few years has aggressively pushed on for carload business, particularly in ore and chat and lumber. The petition alleges that the plaintiffs' lines offer the best outlet, from the location under consideration, to the vast territories served by the Missouri Pacific, the Santa Fé, the Kansas City Southern, and other trunk line carriers. Its principal business is still passenger traffic; the 1926 figures being: From passenger business, $526,063.10; from freight on ore, $176,585.79. It owns no freight cars and but two steam locomotives.

The plaintiffs' lines (sometimes hereafter called the Southwest Missouri) built into the Picher mine district in 1918. This district extends about 3 or 4 miles north and south by 6 or 7 miles east and west. In this area are about 150 mines. When the plaintiffs' line came in, it found the district covered with a network of tracks and sidings, owned by two other short lines, hereafter called the Northeast and the Miami Belt, which in turn were controlled by the Frisco and the M. K. & T. trunk lines. The sidings of these two competitors brought loading facilities within a "few hundred feet of almost every mine in the district." I. C. C. R. No. 12404.

The fight for the ore business began; and this case is but a part of that fight, as was stated by counsel for both sides on argument. Manifestly shippers would not pay a cartage charge for the privilege of using the Southwest Missouri lines, rather than its competitors. The Southwest Missouri undertook to take its sidings to the ore; but the Corporation Commission of Oklahoma denied it that right, probably because it believed the field was already well served.

Failing there, the Southwest Missouri undertook to get a place in the sun by various schedules, the general intent of which was to give it an even chance at the business by absorbing the cartage cost necessary to get the ore to its tracks. Two earlier efforts failed; the last effort is now before us.

To understand the proposed schdule, one custom of the field should be understood. For many years the practice has been to weigh each load of ore on wagon scales, before loading, in order to arrive at the royalty due the landowner and perhaps the wage due the miner. A charge of 50 cents a ton for this service, performed by teamsters, has become established, and that charge includes a haul up to a quarter of a mile. This is referred to as a "turn-around haul." The only significance this custom has is this: At present, a shipper adjoining a siding must pay the 50 cents, and that charge pays for a quarter-mile haul. So, as to any mine within a quarter of a mile of the plaintiffs' lines, no change in tariff·is needed to give it equality of opportunity with its competitors. But, since practically all of the mines are within that distance of a siding of its competitors, and practically none within that distance of its own, where it needs a change in tariff is beyond that zone.

The proposed tariff provides that, if any shipper in the district delivers his ore to certain designated trucking companies, the railroad will transport it from the quarter-mile limit, to the siding free of charge. The tariff reads:

"Item 2. The following trucking companies, operating under contract with the receivers of this company, will transport the shipments from the Ore Bins of the off track mines shown in Item 5, to the Loading Stations as indicated. They will not act as agents of the receivers of this company from the Ore Bins to the end of the turn-around service ($\frac{1}{4}$ of a mile from the Ore Bins), but beyond that, they will act as agents of the receivers of the Company and Receivers of this company assume all carrier's liability for the service from the end of the turn-around haul to the loading station indicated in Item 5. [Here follows list of trucking companies.]

"Item 3. The rate from any off track mine, not shown in Item 5, which is directly intermediate in line of haul, to the Loading Station indicated at any off track mine shown therein, will be the same as the off track mine to which it is intermediate."

The competitors protested, and the Interstate Commerce Commission ordered the tariff canceled. This injunction action followed.

The government's contentions are:

(1) That the business is already well served by the two companies first in the field; that such a tariff would deprive them of their business, would result in destructive competition, and would not, in the end, help the plaintiffs.

(2) That the tariff discriminates (a) between individuals in the same community, and (b) as between different communities, and is unduly preferential in the same respects.

(3) That the tariff constitutes an unreasonable practice.

The problem of a proper regulation of carrier is most difficult and cômplex. Villages and cities spring along railroad rights of way, and the junking of a railroad brings disaster and ruin to whole communities. Rates which will enable less fortunate lines to exist bring unconscionable returns to better located, better financed, and better managed lines. Yet, between competitive points, the tariffs must be the same, or the lesser ones would die of inanition. If discrimination is allowed between competitive and noncompetitive points, or between big and little shippers, again the big swallows the little. These but suggest the complexities of the problem. Congress has struggled with it, and courts should be and are mindful of the difficulties of administration. Yet, if there are still rough spots in the law, a proper ad-

ministration of our government requires that Congress and not the courts change the law.

First, as to the question of discrimination as to individual shippers. Section 2 of the act (49 USCA § 2) prohibits rebates and discrimination among shippers. It is well settled that this section is to "enforce equality between shippers * * * shipping over the same line, the same distance, under the same circumstances." I. C. C. v. Alabama Midland Ry. Co., 168 U. S. 144, 18 S. Ct. 45, 42 L. Ed. 414; Seaboard Air Line v. U. S., 254 U. S. 57, 41 S. Ct. 24, 65 L. Ed. 129.

The tariff under consideration here offers the same service to every shipper. Every shipper in the zone may have his ore hauled free, except the first quarter mile, to plaintiffs' lines. There is no discrimination. Every shipper pays for the first quarter mile; the plaintiffs pay the rest. To support its contention on this point, defendant relies on the two decisions of the Supreme Court, above cited. In those cases the carrier absorbed switching charges to industries located on a competitor's lines, but declined to absorb such charges to other industries. It was properly held that the existence of competition did not justify discrimination. So here, if the service offered by the tariff was limited to those mines within a given distance of a siding of a competitor, and denied to others, it would be bad. But it is not so limited.

It is argued that there is a discrimination between those within the quarter mile zone, and those without the zone, because those without must use the truck companies selected by plaintiffs in order to get their ore hauled free, while those within may select their own draymen. The argument is not persuasive. The carrier offers to haul free, and naturally selects its own draymen. At any rate, the service offered is offered to all alike—to haul their ore, after the first quarter mile, by truckmen selected and paid by plaintiffs. This schedule gives to all shippers "a 'like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions.'" Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U. S. 144, 18 S. Ct. 45, 42 L. Ed. 414; Seaboard Air Line Ry. Co. v. United States, 254 U. S. 57, 41 S. Ct. 24, 65 L. Ed. 129.

Neither is there discrimination between communities. The region served by the tariff is small, it is true, but it is a proper terminal area. Moreover, it appears to embrace the entire field in Oklahoma, where the plaintiff cannot take its sidings to the mines, except a portion served directly by the trunk line carriers; it covers the entire field affected by the 2½-cent arbitrary, collected by these short line carriers. There is a basis for the territorial limits of the tariff, and that is enough. There is a difference between a boy and a man, although the exact hour when manhood comes would be difficult of ascertainment without a statute fixing the twenty-first birthday as the time. And an argument that a young man could as well make a contract the day before he became of age as the day after would hardly invalidate the statute. U. S. v. B. & O. R. Co., 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218. Section 3 (par. 1), 49 USCA § 3, prohibits undue preferences. For the same reasons, there is no undue preference here.

This brings us to the controlling question in this case, the point stressed by counsel for the defendant on the argument, and stated fairly by the Commission in all its opinions. "This territory was adequately served by two other lines, who were there first; to sustain this tariff will be to put a third carrier, which came later, on an equality with the other two, to their detriment. Our duty to the other two requires that the third be kept out."

By the Transportation Act of 1920 (49 USCA), the powers of the Interstate Commerce Commission were greatly broadened. Theretofore their duties were largely negative, to prevent discrimination, unfair practices, unreasonable rates, and improper capitalization. By the amendment their duties became affirmative—to maintain adequate transportation service; to foster weak lines; to protect against ruinous competition. New England Division Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Dayton-Goose Creek Ry. v. U. S., 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472.

Within the limits fixed by Congress, the Commission has the power to stop the economic waste of unnecessarily duplicated service; of stopping or preventing ruinous rate wars; of fixing a minimum as well as a maximum rate. If, within these limits, the Commission should find that to let a second or a third line into a limited business field would bankrupt those already there, the power to do so, under proper evidence, probably exists.

But where, in the act, does that power exist under the facts in this case? The defendant contends that it exists in the two sections (section 1, par. 6, and section 15a; 49 USCA §§ 1(6), 15a). Paragraph 6, § 1,

prohibits "improper practices" in general terms, and is applicable to all interstate carriers, and concededly applies to plaintiffs. Section 15a places the duty on the Commission to see to it that all carriers within the terms of that section earn a fair return, and requires the Commission to prescribe adequate rates. The plaintiffs insist that the Commission acted under 15a, and that seems to be the fact. The language used is that of 15a. The plaintiffs then contend that their lines are excluded from 15a because they are not "engaged in the general transportation of freight." With this, we disagree. It is true that the plaintiffs are not "primarily" or "principally" engaged in that business; but they take all the freight offered; they are fighting for more; their charter powers enable them to engage in the business without restrictions. Their freight business is in no sense limited, except as to the amount they can get; it is therefore "general."

Is this an unlawful practice condemned by paragraph 6 of section 1? A fair argument might once have been made that railroads handled freight from station to station, and that any intermeddling in the business of getting the freight from store to station was an improper practice, and an invitation to rebates and drawbacks. It might once have been argued that the law did not contemplate giving the Commission power to level out the differences between a carrier with a downtown station and one without; between a carrier that built a bridge across the Mississippi and one that did not; between a shipper that paid a high price for a trackage site, and one that did not. But the Interstate Commerce Commission by its rulings, backed up by the courts, has now foreclosed that argument. St. Louis Terminal Case, 34 I. C. C. 453; Washington, D. C., Store Delivery Case, 27 I. C. C. 347; I. C. C. v. Detroit, 167 U. S. 633, 17 S. Ct. 986, 42 L. Ed. 306; Seaboard Air Line v. U. S., 254 U. S. 57, 41 S. Ct. 24, 65 L. Ed. 129.

The practice then of equalizing opportunity of two lines so that each may have its fair share of the business is not only lawful in itself, but has the express sanction of both the Commission and the Supreme Court of the United States.

Moreover the "practices" referred to in the act are those affecting shippers. It has been recently held not to embrace disputes among carriers themselves as to a division of rates or revenues. B. & O. R. Co. v. U. S., 277 U. S. 291, 48 S. Ct. 520, 72 L. Ed. 885.

The controversy here is between carriers as to a division of the business, and is not within the purview of the sections cited. In any event, the "practice" is lawful in and of itself.

The affirmative power given the Commission to protect carriers is found in its power to prescribe adequate rates, (15a) and in subsection 18 of section 1 of the act (49 USCA § 1(18), to prevent undue competition.

By the amendment of 1920, the Commission has the power to prescribe minimum rates, and thus prevent a carrier from cutting its own throat. New England Division Cases, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Railroad Commission of Wisconsin v. C. B. & Q. Ry. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. But it is not here contended that the freight business which the plaintiffs may get under this new schedule is not remunerative. On the contrary, it is conceded that it is profitable to plaintiffs. It is only contended that it is hurtful to its competitors.

We have then a nondiscriminatory tariff, establishing a practice of absorbing a part of the cartage haul, a practice that has been uniformly approved for others, a tariff that is remunerative to plaintiffs, and gives it but a fair chance at the business; if it is unlawful, it can only be because of its effect on its competitors.

We conclude with an appreciation of the difficulty of the question, that the power given to the Commission to protect existing lines against unnecessary competition, to keep out a third where two already well serve the public, is found in paragraph 18 of section 1 (49 USCA § 1(18), which prohibits the construction of new lines without a certificate of convenience from the Commission. Under this section, the Commission prevented the Santa Fé Railroad from running a track from Dallas to an industrial district on the outskirts of Dallas, already served by the Texas & Pacific Railway Company. The Supreme Court of the United States sustained the Commission in a case strongly relied upon by defendant. T. & P. R. Co. v. G., C. & S. F. R. Co., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578.

It is contended here that the cartage facilities offered amount, in substance, to pushing the lines of the plaintiffs a little closer to the mines. Whether that be a sound analogy or no, that section will not avail the defendant, for paragraph 22 of the same section (49 USCA § 1(22) excludes from its application "interurban electric railways, which are not operated as parts of a general steam railroad system of transportation."

It is suggested by counsel for defendant that, if this tariff is approved, the competing companies will ask for a reduction in the general tariffs for the district, in order to restore the inequality now existent, and that, if this is done, the plaintiffs themselves will be hurt. If the plaintiffs have the right of equal opportunity at this business, it is not to be presumed that the Commission would be a part to destroying it by granting such reduction. It will be observed that to permit the other carriers to put in effect this same cartage haul tariff would not disturb the equality, nor affect the revenues, for the Commission has found that "almost every mine in the district" is now within a "few hundred feet" of a loading point on one of the competitor's lines.

At any rate, it will be time enough to determine the lawfulness of an order of the Commission, lowering rates already said by the Commission to be "subnormal," made to restore an unreasonable inequality of opportunity, when that order is made. We cannot be swerved from our duty by such a threat of the competitors. It is also urged that the tariff contemplates 138 "constructive" stations, all of which are mythical, and the result an absurdity. The fiction of "constructive stations" may be absurd; but the fact of absorbing part of the cartage haul is not absurd, unless the free delivery of freight to the store doors at Washington, Detroit, and St. Louis, or the free delivery of express companies, is absurd. The probabilities are that the not far-distant future will see the services of carriers for passengers and freight extended from door to door, rather than from station to station.

As a matter of fact, this schedule does for the petitioners what section 15a contemplates: the plaintiffs are rendering an important service to the communities served by them. Their passenger revenues are so depleted that something must be done. All they ask is equality of opportunity. This schedule helps them discharge their public duty, that of rendering adequate service to the communities served.

Giving full effect to all facts and conclusions found by the Commission, and with great reluctance, we find ourselves unable to find any authority in the law for canceling the schedules under consideration.

An interlocutory injunction will issue as prayed for.

### On Final Hearing.

The plaintiff seeks to enjoin an order of the Interstate Commerce Commission, directing the cancellation of certain schedules on lead and zinc ore. The matter was before us on application for a preliminary injunction, and the question presented appeared to be of enough substance to warrant the granting of that interlocutory order. A memorandum was filed, predicated upon the facts as alleged in the verified bill. The cause has been argued on final hearing and comes on for decision.

Save for one or two inaccuracies of no importance, the earlier memorandum states the facts, and they need not be here repeated in detail. The plaintiff is an electric interurban line, competing with two other steam lines, for the ore business in the Picher field. The other lines reach the mines; the plaintiff does not. To get its share of the business, the plaintiff proposed the present schedule, which shortly provides that the plaintiff will truck the ore to its tracks at its own expense. The plaintiff relies on the practices in St. Louis, Washington, and certain other cities, of permitting railroads to establish fictitious or "constructive" stations, and thus to push their rail heads beyond their physical ends.

As the case was presented to us on the application for a preliminary injunction, we accepted the construction of the order attacked given in the brief for the Interstate Commerce Commission; that is, that the tariff was canceled primarily to protect the revenues of the two competing steam lines. One or two passages from that brief will illustrate our meaning. After citing Dayton-Goose Creek R. Co. v. U. S., 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472, New England Division Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605, and other cases, holding that the Commission now had power to secure a fair return to carriers, the brief states:

"In the light of these decisions it becomes clear that the Commission in passing upon the legality of the schedules in question could not confine its attention to the interests of the Southwestern Missouri alone but was compelled to take into consideration the interests of the other lines directly concerned and of the interests of the carriers and the public generally, as well."

"The Commission's action in ordering the cancellation of the absorption tariffs in question is based largely upon consideration of section 15a. The Northeast Oklahoma and the Miami Mineral Belt are short lines which are largely dependent upon the ore traffic from the Picher district."

"Considering the low level of the rates, the announced intention of the other lines of

publishing similar absorptions or reductions in rates equivalent to the absorptions and the possibility of the practice spreading, the Commission is of the opinion that the proposed schedules would promote destructive competition."

Counsel for the Commission cited Texas & Pac. R. Co. v. Gulf, Colo. & S. F. R. Co., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578, to the effect that a railroad may not build an extension of 7½ miles to reach additional freight business without the approval of the Commission. Counsel then state:

"In the case at bar no question arises under paragraph (22) of section 1, no proposed construction of railroad tracks being in issue. But petitioner admits that its proposed drayage absorption tariffs are in lieu of new construction which the Oklahoma Corporation Commission declined to permit and therefore the reasoning of the Supreme Court in the last quoted case may be applied by analogy to the case at bar."

The briefs filed now assert that the question of the effect on the other lines was no more than a sidelight, if that. We are now assured:

"But the Commission in finding that the rule would constitute an unjust and unreasonable practice was not directly concerned with the controversy between the various carriers with respect to the traffic. Moreover the divisions referred to by the Supreme Court in Baltimore and Ohio R. Co. v. U. S., supra, was the division of revenue and rates and had nothing to do with the division or distribution of traffic among the railroads. There is nothing in the report of the Commission to indicate that its finding that the rule here involved would constitute an unreasonable practice was influenced by the controversy between the carriers as to the division of the traffic.

"The issue before this Court should not be confused because the Southwest Missouri and these intervening defendants are seeking to attract the zinc ore traffic in the Picher district to their respective lines. That aspect of the case has nothing to do with the Commission's duty to declare the rule unjust and unreasonable if the facts warranted that finding. That duty existed wholly independent of the rights of these intervening defendants to have appeared before the Commission."

Interpreting this order as being one intended to prevent the plaintiff from constructively pushing out its rails to the mines, we held that the Commission was without that power, for paragraph 22 of section 1 (49 USCA § 1(22) expressly provides that this power shall not extend to spurs or side tracks or to interurban electric railways.

■ An examination of the record persuades us that this interpretation of the Commission's order is too narrow. The court must go behind the reasons assigned by the Commission or its counsel, if need be, and determine for itself the validity of an order. In Southern Pacific Co. v. I. C. C., 200 U. S. 536, at page 556, 26 S. Ct. 330, 336· (50 L. Ed. 585), it was held: "The defendants object that the, Circuit Court had no authority to decree the enforcement of the order upon any other ground than that taken by the Commission itself. We think that the court was not confined to those grounds, and if it found the rule was, in itself, for any reason illegal as a violation of the act, the order might be valid and be a lawful order, although the Commission gave a wrong reason for making it. If it held that the rule to be a violation of one section, the order to desist might be valid, if, instead of the section named by the Commission, the court should find that the rule was a violation of another section of the act. All the facts being brought out before the Commission or the court, the court could decide whether the order was a lawful one, without being confined to the reasons stated by the Commission. We therefore look to see the ground taken by the Circuit Court."

And in Virginian R. Co. v. U. S., 272 U. S. 658, at page 665, 47 S. Ct. 222, 225 (71 L. Ed. 463), the court held: "This Court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it."

And in I. C. C. v. U. P. R. Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308, the syllabus reads: "An order of the Interstate Commerce Commission within its power cannot be held invalid because it appears that possibly the Commission considered other subjects than the reasonableness of the rate. * * * "

It should be further said that, while the briefs emphasized the matter of competition and rates, the report of the Commission deals with the questions of discrimination and the reasonableness of the practice, and these questions did not receive adequate attention in our former memorandum, prepared as it needs must have been, without an examination of the voluminous record.

■ The law is abundantly settled that findings of the Commission on questions of reasonableness and discrimination, if supported

by substantial evidence, are not reviewable by the courts. The Commission is an expert body, with a national vision. See, among numerous cases, I. C. C. v. U. P. R. Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; U. S. v. I. C. R. Co., 263 U. S. 515, 44 S. Ct. 189, 68 L. Ed. 417; Manufacturer's Ry. Co. v. U. S., 246 U. S. 457, 38 S. Ct. 383, 62 L. Ed. 831; Assigned Car Cases, 274 U. S. 564, 47 S. Ct. 727, 71 L. Ed. 1204; and cases cited supra.

It is unnecessary to determine any question of discrimination, of the effect on shippers of the limitation of this tariff to lead and zinc, or of discrimination between communities; or of the possibility of rebates. It is sufficient to hold, as we do, that, even upon plaintiff's own theory, the Commission is the proper body to determine whether the fiction of constructive stations established in congested areas of large cities should be extended to a small ore field in Oklahoma. Northern Pac. Ry. Co. v. Solum, 247 U. S. 477, 38 S. Ct. 550, 62 L. Ed. 1221. The Commission has decided it, and upon proper evidence. That ends our inquiry.

The preliminary injunction will be dissolved, and the bill dismissed.