POWELL et al. v. UNITED STATES (POL-LARD, Intervener).

No. 325.

District Court, S. D. Georgia.

May 31, 1935.

Chas. T. Abeles and W. R. C. Cocke, both of Norfolk, Va., and J. Randolph Anderson, of Savannah, Ga., for plaintiffs.

J. Saxton Daniel, U. S. Atty., of Savannah, Ga., for the United States.

T. Mayhew Cunningham, of Savannah, Ga., for intervener.

Before SIBLEY, Circuit Judge, and DEAVER and BARRETT, District Judges.

PER CURIAM.

This is a proceeding before a statutory court organized under 28 U.S.C.A. § 47, to set aside an order of the Interstate Commerce Commission by authority of 28 U.S. C.A. § 41 (28).

The order of the commission is as follows:

"This case being at issue upon complaint and answers on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the Commission having on the date hereof made and filed a report containing its findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof; and said Commission in said report having found the provision of the Seaboard Air Line Railway Company schedules, I.C: C. No. A–6826, Sixth Revised Page 139, effective December 4, 1933, that 'Fort Benning Junction, Ga., switching limits include the receiving and delivery tracks at Fort Benning Military Post' to be unlawful:

"It is ordered, That Sixth Revised Page 139 of said schedules, be, and it is hereby stricken from the files of this Commission."

The schedule ordered stricken from the files reads:

"Switching at Fort Benning Junction, Ga.

"Reciprocal Switching.

"Fort Benning Junction, Ga., switching limits will include the receiving and delivery tracks at the Fort Benning Military Post."

Jurisdiction.

The United States challenges the jurisdiction of this court in this cause because (a) the action of the commission in ordering the Seaboard tariff "stricken" from its files is an accomplished fact and that the only remedy is by mandamus, (b) such order is negative in that it does not direct the Seaboard to do or not to do anything and that such an order is not reviewable under the act, and (c) there is an adequate remedy at law.

If the objection that the order is not reviewable because the act complained of is an accomplished fact and cannot be enjoined be well founded, no order of the commission canceling a tariff could be ever attacked. It should be remembered that this court has power not only to "enjoin" but also to "set aside annul, or suspend in whole or in part any order of the Interstate Commerce Commission." The prayer is not only to enjoin, but that such order "be set aside and forever annulled."

It is urged that because the order does not order the Seaboard to do anything it is negative and is not reviewable. Cases are cited holding that orders negative in form and substance are not reviewable, but where negative in form but have an affirmative effect they are reviewable. United States v. New River Co., 265 U.S. 533, 44 S.Ct. 610, 68 L.Ed. 1165; Alton R. Co. v. United States, 287 U.S. 229, 53 S.Ct. 124, 77 L.Ed. 275; U. S. v. Atchison, T. & S. F. R. Co. (Inter-Mountain Rate Cases), 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408. The contention that this is a negative order is not sustainable even if it be limited to the very terms of the order, for that is affirmative in form and substance. If it be claimed not reviewable because there is no order directing the Seaboard what to do or refrain from doing, such contention falls, because it does by necessary implication forbid the Seaboard from continuing the use of such tariff. While there is no affirmative spe-

cific authority in the statute empowering the commission to "strike from its files" tariff schedules, it is clear that taking into consideration the requirement of the statute, 49 U.S.C.A. § 6 (1), that a tariff in order to be lawful must be filed with the commission and the prayer of Pollard, receiver of the Central of Georgia Railway (hereinafter called Central), that such tariff "may be declared unlawful, null and void; and that the said receivers may be required to cancel it," such order fairly interpreted° is that such tariff is null and void and is canceled. The judgment of this court declaring such order to "strike from its files" void would have the effect of leaving the tariff unaffected by said order of the commission.

■ The fact that Congress has provided that remedy is proof conclusive that the remedy at law of disproving the legality of the order is not adequate and that there is equity in the bill.

### Findings of the Commission.

■ Has the commission made sufficient findings of fact to justify a judgment that the order of the commission is valid?

The "basic or essential findings required to support the commission's orders" are necessary. State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291. Lack of express findings by an administrative agency cannot be supplied by implication. Atchison, T. & S. F. Ry. Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382—citing Panama Ref. Co. v. Ryan, 293 U.S. 388, 483, 55 S.Ct. 241, 79 L.Ed. 446; Beaumont, etc., Ry. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 75 L.Ed. 221; Interstate Commerce Commission v. Chicago, etc., R. Co., 186 U.S. 320, 341, 22 S.Ct. 824, 46 L.Ed. 1182.

But "it is true that formal and precise findings are not required, under section 14 (1) of the Interstate Commerce Act (49 U.S.C.A. § 14 (1), which declares that the report 'shall state the conclusions of the commission, together with its decision.' * * * That provision relieves the Commission from making comprehensive findings of fact similar to those required by Equity Rule 70½ (28 U.S.C.A. following section 723). But Section 14 (1) does not remove the necessity of making, where orders are subject to judicial review, quasi jurisdictional findings essential to their constitutional or statutory validity." United States v. B. & O. R. Co., 293 U.S. 454, 55 S.Ct. 268, 273, 79 L.Ed. 587.

In the hearing before the commission resulting in the order herein complained of, and to which hearing both the Seaboard and the Central were parties, the entire record in Finance Docket 9709 relating to the application of the Fort Benning Railroad for a certificate of public convenience and necessity was introduced by agreement. This is affirmatively set forth in the report of the commission dealing with the tariff complained of. There were thus three reports of the commission upon which the order complained of was founded, it affirmatively appearing that they all were considered by the commission, and it would have been inexcusable tautology to have repeated findings already made and already a part of the record.

Such findings are:

1. The United States has established on some 98,000 acres of land near Columbus, Ga., Camp Benning, and through such camp built railroad tracks connecting at Fort Benning junction at a distance of some 6.8 miles from the delivery tracks of the Fort with both the Central and Seaboard. For a while the United States hauled freight from the junction to the delivery tracks and did the intra Fort switching and then for some years the Central did such work. A contract was then made by the government with Page and Harris by which the government's railroad tracks were to be leased to them, they were to be paid $1,000 a month for the intra switching and $5 a car for the haul from the junction to the delivery tracks. Such lessees were to organize a railroad, procure a certificate of public convenience and necessity from the Interstate Commerce Commission, and thereafter there would be no charge for the haul from the junction to the delivery tracks, Page and Harris expecting, when organized as a railroad, to be able to make arrangements with the trunk line carriers for a division of through rates. There were certain charges to be made for commercial shipments, not necessary to detail here. The application by the Fort Benning Railroad for a certificate of public convenience and necessity was first granted (193 I.C.C. 223), but upon a rehearing was refused (193 I.C.C. 517). Page and Harris continued the hauling and switching as private carriers. Thereafter on November 3, 1933, effective December 4, 1933, the above-quoted tariff was filed by the Seaboard. The result of this was to relieve shippers over the Seaboard of all cost of hauling from the junction to the

delivery tracks at the Fort. "The Seaboard employed Page and Harris as its agents to perform the transportation service in hauling cars between Fort Benning Junction and the receiving and delivery tracks at Fort Benning, and pays them therefor $12.50 per car when the revenue is $25.00 or more per car, and when the revenue is less than $25.00 one half thereof." "The Central, however, has not established a tariff similar to that of the Seaboard, and since it does not publish rates to Fort Benning proper it accepts and delivers traffic intended for the Fort, except on traffic moving under government bills of lading, at Fort Benning Junction." Such freight via the Central must pay for the haul from the junction to the Fort.

2. "While the facilities may have the physical aspect of a plant facility, the circumstances of their purpose and ownership clearly distinguish them from industrially controlled and operated railroad properties in the application of regulatory policies."

3. Estimated earnings of the Fort Benning Railroad would be "the equivalent of an average of about $15 a car for the short movement between the reservation and the junction. This revenue would accrue from divisions of joint through rates, and, therefore, would operate as a reduction, pro tanto, of the Central's or the Seaboard's revenue for the line haul." "Here the applicant (Fort Benning Railroad) and its sponsors would be the sole beneficiaries of such practices and at the expense of established carriers whose properties are in receivership."

4. The Seaboard has by the tariff here considered extended its line over the government owned railroad to the Fort.

5. "Fort Benning is not an industry and may more properly be described as a small city or town."

### Order of Commission Justified.

■ If the order of the commission be valid though based upon an erroneous principle as stated in its report, it should be sustained.

It is true that the commission in its report declared: "Our finding of unlawfulness of the tariff here under consideration, therefore, is not predicated on the fact that the Seaboard has violated section 1 (18), but rather on the fact that it has published rates to and from Fort Benning, a station not on its line and which cannot be reached by it or any other common carrier, and consequently it cannot pay out of its line haul rates for a service which it is not legally obligated to perform and which it cannot perform except through the employment of the contractors with the government," and also declared: "A carrier has no right by tariff to include within the switching district tracks over which the carrier has no right to operate as a common carrier, or which cannot be used by other common carriers through switching arrangements or otherwise."

But those are not all of the declarations in the report, for we find there, after reciting the contentions of the Seaboard and Central, the latter being "that by publishing the tariff heretofore referred to and by the employment of Page and Harris as its agent to perform the transportation service over the line of railroad there considered the Seaboard and Page and Harris are now doing the very thing which we condemned by the decision in the Fort Benning Case," this statement: "Consideration has been given to the contention of the parties, but the tariff is unlawful on other grounds." Surely this does not reject the view that such tariff is unlawful because of such arrangement, but merely gives other grounds.

■ Apparently the only reason that the commission did not declare as a basis for its order the fact that the Seaboard was in fact, though not in name, operating a railroad without having first obtained a certificate of public convenience and necessity was because it was misled as to the meaning of section 1 (20), 49 U.S.C.A. § 1 (20), of the Interstate Commerce Act. It is true that such section provides: "Any construction, operation, or abandonment contrary to the provisions of this paragraph * * * may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest." It is also true that no party in interest can initiate a proceeding before the commission to have it in form or substance enjoin the operating of a railroad in violation of section 1 (18) of the act, 49 U.S.C.A. § 1 (18). Texas & Pac. R. Co. v. Gulf, etc., R. Co., 270 U.S. 266, 46 S.Ct. 263, 264, 70 L.Ed. 578; but "if application for a certificate has been made, he may appear there in opposition. If no such application has been made, paragraph 20 affords him the only remedy." Id. In the instant case

the Central had the right to intervene and did so.

It must be borne in mind that there was no urge that the commission enjoin the violation of section 1 (18), 49 U.S.C.A. § 1 (18), but merely that the tariff be canceled. Uncanceled, it apparently panoplies the Seaboard against attack in courts for violation of section 1 (18). Surely the commission must have authority after declining the issuance of a certificate of convenience and necessity to prevent the continuance of the use of its files and its apparent approval of a scheme to defeat its formal decision. No one contends that the commission can enjoin the Seaboard from either directly or indirectly violating section 1 (18), any more than it could punish it criminally. But it can hardly be contended that the commission must unwillingly acquiesce in fortifying a scheme it disapproves.

■ Another sufficient reason for sustaining the order, and disclosed in the report of the commission, is that the tariff unduly impairs the line haul revenue. This is authorized under the Emergency Railroad Transportation Act, 48 Stat. 212, § 4 (49 U.S.C.A. § 254): "The purposes of this title [chapter] are (1) to encourage and promote or require action on the part of the carriers and of subsidiaries subject to the Interstate Commerce Act, as amended [chapter 1 of this title], which will * * * (b) control allowances, accessorial services and the charges therefor, and other practices affecting service or operation, to the end that undue impairment of net earnings may be prevented, and (c) avoid other wastes and preventable expense."

See New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605; Dayton-Goose Creek Ry. Co. v. United States, 263 U.S. 456, 458, 44 S.Ct. 169, 68 L.Ed. 388, 33 A.L.R. 472; Wallower v. United States (D.C.) 32 F.(2d) 524, wherein on page 527 in graphic language it is declared that the commission has power to "prevent a carrier from cutting its own throat."

The urge of the Seaboard is that the order attacked has the effect of an injunction, even though not in such form, and thus in its brief states the duty of the court: "The duty of the court in these circumstances has been cited in Southern Pacific Co. v. Interstate Commerce Commission, 219 U.S. 433, 31 S.Ct. 288, 55 L.Ed. 283: 'Although the order made by the Commission may have been couched in a form which would cause it, superficially considered, to appear to be but the exercise of an authority (possessed by the Commission), yet if it plainly results from the record that the order of the Commission was not the exercise of such an authority, but was based upon the assumption by that body of the possession of a power not conferred by law, the mere form given by the Commission to its action does not relieve the courts from the duty of reviewing and correcting an abuse of power.'"

Such quotation loses its cogency when it is discovered that the court was therein merely stating the "contention." It further loses its force in this case when it is further discovered that in the said case there was apparently an effort to have it appear that the reason for setting aside a rate was because of its unreasonableness, when that was not its true reason. Far different is it here.

"In a suit by the Interstate Commerce Commission to enforce an order made by it, the court is not confined in passing on the validity of the order to the reasons stated by the Commission," and "the defendants objected that the circuit court had no authority to decree the enforcement of the order upon any other ground than that taken by the Commission itself. We think that the court was not confined to those grounds, and if it found the rule was, in itself, for any reason illegal as a violation of the act, the order might be valid and be a lawful order, although the Commission gave a wrong reason for making it. If it held the rule to be a violation of one section, the order to desist might be valid if, instead of the section named by the Commission, the court should find that the rule was a violation of another section of the act. All the facts being brought out before the Commission or the court, the court could decide whether the order was a lawful one, without being confined to the reasons stated by the Commission. We therefore look to see the ground taken by the circuit court." Southern Pac. Co. v. Interstate Commerce Comm., 200 U.S. 536, 556, 557, 26 S.Ct. 330, 336, 50 L.Ed. 585.

"In suit to enjoin operation of order of Interstate Commerce Commission directing plaintiffs to cancel certain proposed schedules theretofore filed with Commission, court must, if necessary, go behind reasons assigned by Commission or its counsel for making order, and determine for itself va-

lidity of order." Wallower v. United States (D.C.) 32 F.(2d) 524, 529.

The contention that the order is invalid because it fixed no time for it to become effective gives us no trouble. There is no reason for fixing a date, for there is no order to do anything. It is self-executing. It merely destroys, by declaring void and canceling, a tariff—an apparent justification for an improper practice.

### Counterclaim.

The counterclaim of the Central is to the effect that the Seaboard should be enjoined from continuing the practice denounced by the said order if the order of the commission should be sustained. Such counterclaim is founded upon Equity Rule 30, 28 U.S.C.A. following section 723. The motion by the Seaboard to dismiss the counterclaim is thus set forth in the brief of the Seaboard:

"(1) The counterclaim involves issues which are not germane to those of the bill of complaint and are therefore not the proper subject of a counterclaim under Equity Rule 30.

"(2) The counterclaim seeks affirmative relief from this court which, if granted, would directly affect and disturb the possession management and control of the property of which plaintiffs are receivers, and therefore involves a controversy which is cognizable only by the courts of their appointment. This court is accordingly without jurisdiction to adjudicate the subject matter of the counterclaim.

"(3) The jurisdiction of the statutory court of three judges is limited to a determination of the validity of the order of the Interstate Commerce Commission challenged in the bill of complaint filed in this cause, and cannot be extended to the adjudication of a controversy cognizable only by a single judge."

It is difficult to conceive that it will be necessary for an injunction to be issued as prayed for by the Central after the order of the commission shall have been declared valid, but the counterclaim, having been presented, calls for determination, especially in view of the motion to dismiss.

It is conceded that the counterclaim must be of an equitable nature and must be one of which the District Court has jurisdiction.

It is urged that the counterclaim cannot be allowed in this proceeding for the reason that the Central is not a defendant to the bill as brought, the only defendant therein being the United States. A significant difference in this proceeding from one where the intervener is a volunteer is found in the provision of the act which permits any party at interest as a matter of right, and not of grace, to intervene. See said section of the above cited title U.S. C.A.

The most recent case cited in support of the motion to dismiss is that of Brandtjen & Kluge, Inc., v. Freeman, Inc., (C.C. A.) 75 F.(2d) 472, where it was held, as stated in the headnotes: "Intervening defendant cannot inject into main suit controversy to which original defendant is not party by counterclaim against plaintiff."

A number of cases are cited to sustain this view, but the following language in the opinion would indicate that it is quite possible that if the intervening defendant had been such as a matter of right and not of grace, the decision might have been otherwise [75 F.(2d) 472, page 473]: "Thus in the end our choice depends upon what we deem to be the balance of advantage. We cannot see that it dips clearly enough to the defendant's side to disregard the decisions we have cited. Besides, there is something to be said for the notion that a man should be able to keep his suit in his own control, unless good reason be shown why he should not. Although it is in general desirable that as much litigation as possible should be cleared up at once, other interests at times may prevail. Having to choose here between an interpretation which will let in all such counterclaims or shut them all out, we choose the second."

The counterclaim is based upon an issue germane to that of the original bill, for it asks for the enjoining of the violation of an order of the commission which has the effect of canceling a record which might apparently justify the continuance of the practice which has been condemned.

A sufficient answer to the second ground of the motion to dismiss is that the receivers had authority to institute the main suit with which this counterclaim is connected, and therefore they subject themselves to such counterclaims, set-offs, or recoupments as might arise, even though they could not have been set up in an original suit except in the court appointing the receivers or by its permission. Further it is by no means certain that the order of the court appointing the receivers, which was

introduced in evidence, is not sufficient, independent of the above, to justify consideration of the counterclaim.

By stipulation, this hearing was both interlocutory and final.

### Findings of Fact.

1. The findings of fact by the commission, as stated above, are adopted and made a part of these findings without repetition thereof.

2. There are no stations on the line between Fort Benning junction and Fort Benning.

3. The volume of freight handled between Fort Benning junction and Fort Benning is quite large and the revenue therefrom is large.

4. Under an arrangement between the Seaboard and Page and Harris, the latter should receive on shipments of coal to Fort Benning a division of 50 cents out of a revenue of $1.42, and from Fort Benning junction should receive on refined petroleum products shipped from Savannah, Ga., to Fort Benning $33\frac{1}{3}$ per cent. of the Seaboard's revenue and should receive comparable divisions on other commodities.

5. The Fort Benning line operated by Page and Harris is not an extension, branch, connecting track, or cut-off of any other line of railroad.

6. The line from Fort Benning junction to Fort Benning is not a spur, industrial, switching, or side track, as defined in section 1 (22) of the Interstate Commerce Act (49 U.S.C.A. § 1 (22). The haul from the junction to the Fort is a line haul service extending beyond the point that the Seaboard or any other railroad is entitled to operate and to which point beyond the junction no tariff as a line haul applies.

7. The Seaboard has not received a certificate of public convenience and necessity to extend its line from the junction to the Fort.

8. The Seaboard has not obeyed the order of the commission attacked in this case and is continuing to absorb the charges of Page and Harris on all freight shipped by the Seaboard and moving between Fort Benning junction and the receiving and delivery tracks at Fort Benning and is otherwise conforming to its practices and arrangements which were in effect prior to the order of the commission.

9. The order appointing the receivers of the Seaboard provides, among other matters, as follows: "Said receivers are authorized and empowered to institute and prosecute, within this judicial District or elsewhere, in any court or before any officer, department, commission or other tribunal, and in their own names as receivers or in the name of the Railway Company as they may be advised by counsel, all such actions, proceedings or suits as in their judgment may be necessary for the recovery or proper protection of said property, or any part thereof, and the discharge of their trust and likewise to appear in and defend any and all actions, proceedings or suits which may be instituted and prosecuted against them as receivers in or before any such tribunal."

### Conclusions of Law.

1. This court has jurisdiction to review the order of the Interstate Commerce Commission attacked in this cause.

2. The order of the Interstate Commerce Commission striking the Seaboard's tariff from its files is lawful and valid.

3. The counterclaim is germane to the main suit, is equitable in nature, is cognizable by a United States District Court, and this statutory court being necessary to consider the main case, it has jurisdiction of the counterclaim, and is entitled to a permanent injunction against the operation by the Seaboard under its tariff as prayed.

Let a decree be entered accordingly.

SIBLEY, Circuit Judge (dissenting).

I agree that the commission's order is one that we have jurisdiction to set aside, and its failure to name an effective date does not invalidate it, but I do not think the commission has made findings sufficient to support it. Atchison, Topeka & S. F. Ry. Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382, decided April 29, 1935. The putting in evidence of the former proceedings in which Page and Harris were denied a certificate of public convenience did not make the findings in that case findings in this one. The Seaboard Air Line Railway Company and its receivers were not parties to that proceeding and Page and Harris are not parties to this one.

The commission did not there hold that it was against the public convenience for any one to operate the Fort Benning tracks. On the contrary, its position was that for reasons of economy they should not be operated as a short line, but that some connecting carrier should operate them. This

the Seaboard is attempting to do. Its doing so is no evasion of the commission's former order, but is in conformity with it. The real objection is that the Seaboard is doing it free. The commission, perhaps, thinks it unwise or unreasonable that it be done free, but it has made no such fact finding. If it had, its order might stand, but cannot stand without it. The fact is of the class peculiarly for determination by the commission. The commission distinctly disclaims as a ground for its order that the Seaboard is operating to Fort Benning without a certificate of public convenience, and concedes that a court injunction under Interstate Commerce Act, § 1 (20), 49 U.S. C.A. § 1 (20), is the exclusive statutory remedy for that. Its statement that "a carrier has no right by tariff to include within the switching district tracks over which the carrier has no right to operate as a common carrier, or which cannot be used by other common carriers through switching arrangements or otherwise," will not support the order. The first clause is bad in law, for carriers daily and everywhere switch over privately owned tracks. If they are going to do so, the act merely requires that the filed tariff so state, with the charge to be made for the service. The last clause is also wrong in fact, for the proof and the finding of the commission are that the other common carrier, the Central, can, if it wishes, make the same switching arrangements which the Seaboard has. The commission raises a question of the validity of the right by which the government's tracks are being used, but it does not lie with the commission to object if the government is not objecting, nor to inquire into the title of the carrier to the tracks used. Cleveland, C., C. & St. L. Ry. Co. v. United States, 275 U.S. 404, 405 (8), 48 S.Ct. 189, 72 L.Ed. 338. The commission says: "Our finding of unlawfulness of the tariff under consideration therefore, is not predicated on the fact that the Seaboard has violated Section 1 (18), but rather on the fact that it has published rates to and from Fort Benning, a station not on its lines and which cannot be reached by it or any other common carrier." This is not true in fact, for the Seaboard's tariffs read as they always did to Fort Benning junction. The amendment which is canceled proposes to switch free on to Fort Benning. It is as though a mill owned tracks to its mill village, whether near or far, and the Seaboard was proposing to switch free over them. The commission's last position: "And consequently it cannot pay out of its line haul rates for a service which it is not legally obligated to perform and which it cannot perform except through the employment of contractors with the government" begs the question. If this service is switching requiring no certificate of public convenience but only a filed tariff, it becomes, after the tariff is filed, one which the carrier is obligated to perform. If instead of hiring its own crew to do it it hires Page and Harris, it should pay them. It is wholly immaterial whether Page and Harris own the tracks, lease them, or contract otherwise with their owners. The true questions are: First, whether this is switching or operating an extension without a certificate of public convenience to be tested exclusively by a suit for injunction? Second, can the Seaboard afford financially to do what it is doing, or is the switching service unreasonably cheap? The commission might so find, but it has not.

The Central has sought by a so-called counterclaim to litigate the first of the two stated questions. The Seaboard's objection thereto ought to be sustained. Equity Rule 30 (28 U.S.C.A. following section 723) as to equitable counterclaim refers to defendants whom the plaintiff has impleaded. The receivers of the Seaboard sued the United States in the Southern District of Georgia where they themselves are not liable to suit. The Central has intervened to support the attacked order, as it has a statutory right to do. The proceeding is by statute before a specially organized court, and the appeal provided is an extraordinary one direct to the Supreme Court. Such a case is not to be complicated even by the plaintiff with matters of ordinary equity triable by one judge with appeal to the Circuit Court of Appeals. Pittsburgh & W. Va. R. Co. v. United States, 281 U.S. 479, at page 488, 50 S.Ct. 378, 74 L.Ed. 980. Much less can an intervener drag such in and also obtain a venue which he could not otherwise have had. In Chicago Junction Case, 264 U.S. 258, 259, 44 S.Ct. 317, 68 L.Ed. 667, there was no injection of another cause of action, but only a bringing into the case of parties who had acted on the attacked order that they might defend it and be bound by the result. The court of three judges ought to strike the so-called counterclaim.